Good morning, Your Honors. May it please the Court. Elizabeth Richardson-Royer on behalf of Yvonne Lattimore. I plan to reserve... Speak up a little bit. Get a little closer. Thank you. I plan to reserve three minutes... Just move the mic up a hair. There you go. Thank you. I'm planning to reserve three minutes for rebuttal, but I will watch the clock. This morning, I plan to focus on the District Court's erroneous denial of Ms. Lattimore's motion to substitute Counsel Mike Hinckley, despite an irreconcilable breakdown in the attorney-client relationship. This Court has a set of three factors to look at when reviewing a District Court's refusal to substitute counsel, the adequacy of the District Court's inquiry, the extent of the conflict between the client and her attorney, and the timeliness of the request for substitution. Counsel, as you very well know, irreconcilable differences are one thing, but trial tactics are quite another. And at least from what I'm seeing here, Ms. Lattimore, she wanted to tell him what to file, what documents and witnesses to call, seem to be a matter of trial strategy as opposed to irreconcilable differences. What am I missing? I think certainly there were disagreements earlier on in the attorney-client relationship about strategy. The list of questions she sent Mr. Hinckley in December, months before trial, is an example of that. She gave additional disagreements in support of her request for substitution, but I think the crux of the conflict was that these two individuals could not communicate any longer. But she did that with every — I mean, ultimately, we're talking six lawyers. She did that with everybody, and she complained to the State Bar. How can it just be irreconcilable differences unless she can't get along with anybody? Well, I think — so there were six lawyers altogether, including Mr. Hinckley. The record is — doesn't explain why the FPD office withdrew. We don't actually know what that conflict was about. We know that the conflict with Mr. Funk was different than the conflict with Mr. Hinckley. She got along with Mr. Plotsky fine. Mr. Plotsky withdrew because of medical or personal reasons. So she had — you know, she had a lengthy period of time with Mr. Funk where she was getting along fine with him. The complaint that she made was not right before trial. And then she had a lengthy period of time where she got along fine with Mr. Plotsky. So I don't think it's clear from this record that she couldn't get along with anyone. And in fact, she got along fine with Mr. Hinckley until their visit on April 4th, when things really fell apart. Whose burden is it to show irreconcilable conflict? Well, it's — it's the defendant's burden when she's asserting that her rights are being violated. And I think that she amply showed that here. And if you look at Mr. Hinckley's representations to the court, they were not communicating any longer. There was a total breakdown. And by the time of trial, there was no communication between these two. He accused her of lying. He accused her of manufacturing evidence. There was a total lack of trust from his perspective. And from her perspective, she also felt that he was lying, did not have her interests at heart, and was not preparing a defense for her. And so in terms of the conflict, this is the kind of conflict that this Court has found repeatedly justifies substitution of counsel. And this was a request that was made in a timely manner. It was three weeks before jury selection, plenty of time to substitute counsel. The only — the only quibble that I make with the district court's inquiry is that the court didn't inquire how long new counsel would need to get up to speed. But there were almost four years of delays that were not attributable to Ms. Lattimore prior to this, including the trial court's schedule. And so whatever short delay might have been necessary for new counsel to get up to speed really is minimal in the context of that lengthy delay. One of the strongest cases for the United States is Mendez-Sanchez. How do you distinguish that case from this one? In that case, the lawyers were clear that they bore no animosity toward their client. They were still able to communicate with him reasonably well about many subjects. There were some things where when they tried to talk to him, he shut down, and they felt that he just didn't want to hear what they had to say. But they were clear with the Court that they bore him no ill will. They were happy to continue their representation, and they were able to do so and to continue communicating with him substantively in many areas. So that case is really different from here, where Mr. Hinckley is afraid for his livelihood. He's not returning Ms. Lattimore's calls. She's not communicating with him. They're accusing each other of lying. It's a really different scenario in terms of the breakdown. Let's assume for a moment that the district court had extended the pretrial motions deadline. What motions would Hinckley have filed? That I don't know from this record, and I think that's the problem, is that the deadline to file motions came during a time when Mr. Plotsky was functionally not representing Ms. Lattimore. On January 7th, he texted her to say that he was withdrawing for medical reasons. He was not able to file these motions, even though he told her that he would. And then when Mr. Hinckley wanted time to file the motions, the Court said no, and so we don't know what he would have filed. And I think that's the problem here. Well, it's a problem, but how do you show prejudice in the absence of any filing in the district court saying, look, I wanted to file X, Y, and Z? I mean, that's the difficulty here. You can't just base prejudice on speculation. That's true, Your Honor, and I think the only motion that was discussed by multiple trial counsel was the motion to suppress, and the government asserts that that motion is baseless, but I don't think we have enough in the record to know. Well, let me ask you this. Let me ask you it a different way. We know what evidence was put into trial. What evidence that was put into trial would there have been a motion to suppress or some other motion that would have been successful? Well, the motion to suppress had to do with her statements to law enforcement, and so to the extent that Your Honor is suggesting that we have to show that the outcome of trial would be different, I'm not sure that that's the standard here. I understand, but what evidence was submitted in the record where there would have been a realistic motion to be filed? I think the record is unfortunately not well developed on that point because Mr. Hinckley was told, you know, don't. He said, I want to look into various pretrial motions, and the court said no. I understand that. I'm saying taking the evidence that's there now, looking at it in hindsight, what evidence would have been subject to a legitimate motion to suppress? I think that the trial evidence wasn't the subject to the motion to suppress. We just don't really know what the evidentiary picture would have looked like if more pretrial motions had been litigated, and so I think, you know, the fact that the deadline came during a time when she was functionally unrepresented and then counsel was told not to even look into those motions I think is problematic just on its face, and because he didn't look into it and didn't file them, we don't know. You said you wanted to save roughly three minutes. Do you want to do that or do you want to keep going? Yes, thank you, Your Honor. Very well. All right, let's hear from the government. Thank you. May it please the Court, Annie Schafer with the United States. I also want to start with the denial of the substitution motion here, as my colleague on either side did. Counsel, can you move closer to the microphone? It's not coming in well in the courtroom here, so if you can either turn up the volume or speak louder, please. I'll try to speak louder. Is this okay?  This Court here did not abuse its discretion in denying Lattimore's motion to substitute counsel, nor did it violate her Sixth Amendment right in doing so. The Court's thorough inquiry, its timing of the motion, and the extent of the conflict all supported the Court's decision here. We want to touch briefly on the adequacy of the inquiry. There's two purposes for this. One is to create a sufficient basis to make an informed decision, and the other is to ease the distrust and concerns and questions of the defendant. The Court did both here with its inquiry. Over the course of two hearings, it asked multiple questions, both open-ended and specific, to try to drill down into the source and the nature of the extent of the conflict between Ms. Lattimore and Mr. Hinckley. These hearings showed that the Court clearly understood the governing legal standards, it understood the law, the cases, and what it needed to look for. It reviewed multiple filings from Ms. Lattimore, gave her ample opportunity to present all her conflicts or supposed conflicts, and it inquired into each of these. And based off of the Court's inquiry, I think it's important to see what exactly is the nature and source of her conflict. So Ms. Lattimore made several allegations. She had the letter with the 16 conflicts, for example, and a lot of those primarily were disagreements that she had with Mr. Hinckley about the witnesses or documents to subpoena, and my colleague on her side points out that Mr. Hinckley had a concern about the bar complaint. I think the timing of the events here show that this was a concern that was dissipated by the time that it went to trial. Well, let me ask you this. Wouldn't the fact there's a pending bar complaint cause an attorney like Mr. Hinckley to be walking on eggshells and be maybe not as open and honest with his client because he's concerned about whatever he says could be used in a bar complaint against him? I mean, I absolutely agree that it can be a very challenging situation. I think this Court has recognized that even a pending bar complaint against one's attorney is not sufficient to raise a Kyler v. Sullivan conflict of interest claim because ultimately it depends on whether or not it affects that attorney's ability to defend the client at trial. And here what we have is a record that shows that Mr. Hinckley, despite these challenges, despite the Court denying the motion to substitute, went forward and presented a more than adequate defense for Ms. Lattimore. Well, doesn't the attorney's ability to communicate with his client factor into his ability to represent the client? Yes, Your Honor. The communication is very important, but I think for a Sixth Amendment chronic type of claim, it has to be a complete breakdown. If you look at the evidence in the record here, you see that the communication still continued. I think there were Ms. Lattimore herself in a later filing in the record, filed multiple text messages between herself and Mr. Hinckley. And these are in 2 ER 74 to 107. And so these are text messages that occurred between August of 2022 until that April 4th meeting. And these show that the communications between them were communicative. They were cordial. Lattimore was constantly making demands of him, asking him for documents, asking him to do certain things. He's responding in a very generally agreeable manner. He's patient with her. There is one point around March 29th. This is at ER 101 to 104. Lattimore makes, again, a bunch of demands and kind of a backhanded comment about his three years of experience and how he should know better. And he tells her, hey, no reason to be mean. And then when she says, well, I'm not being mean, he says, okay, I'm sorry. I was sensitive. Let me get these things for you. I mean, this is, again, you see the nature of the communications. You see after these April 14th and April 17th hearings, after Judge Cousins denies the motion to substitute, there's continued emails from Ms. Lattimore to Mr. Hinckley about the trial. This occurs in 2 ER 61 to 62 and 64 to 72. There are still communications between them, even before and after that motion to substitute. So this is not a complete breakdown here, despite what Ms. Lattimore is claiming. Let me ask you this. After Mr. Hinckley replaced Mr. Plotsky due to his illness, the government stipulated that Hinckley ought to receive additional time to prepare potential pretrial motions. Since the government agreed to that, can you concede the government really couldn't be prejudiced based upon the delay that would have been represented by the pretrial motions? I don't know if it's so much about prejudice of the government here. I think ultimately, there was just no showing of good cause by the defendant. I mean, I think that's a problem. I understand that, but what I'm asking is, haven't you really conceded that had the delay been granted, you would not have been prejudiced? It's hard to tell because we don't know what motions would have been brought, and that burden is on the defendant. I think Judge Ray's pointed this out aptly early on in the trial with my friend on the other side, but Lattimore's answer is that she doesn't know, and yet it's her burden to show that. The fact is, the evidence in this trial, this was about government fraud. The majority of the evidence in this trial were government documents that were obtained by subpoena. There was not a single bit of evidence that was obtained either by a Fourth Amendment search or even statements that Ms. Lattimore gave to law enforcement. Early on in this case with Ms. Taylor, what the record shows is there was some disagreement about a motion to suppress, and Ms. Taylor said on the record, she tried to explain to Ms. Lattimore that there's nothing to suppress when, essentially, I think the issue was Lattimore had said that she believed she should have been Mirandized when the marshals picked her up for her initial appearance, but then she didn't make any statements there, so there would have been no statements actually to suppress that would have given a basis for a suppression motion. There's otherwise no other indication what a suppression motion would have been brought. I would also say that with suppression motions, I mean, this was years into litigation. There is some prejudice once we have a suppression motion that's raised years after that supposedly unlawful search or interview or whatnot, and so, again, I can't tell for sure whether or not there's prejudice, but the difficulty with making some sort of assertion is that we don't know what Rule 12 motions would have been brought. With regard to the motions in Lemonnay, the other pre-trial motions, the government did agree that those could be filed later on with Mr. Hinckley's appointment, and Mr. Hinckley did file multiple motions in Lemonnay later on in the proceedings. Since Lattimore raised the issue of filing pre-trial motions at the March 18th and April 19th status conference, the March 18th pre-trial motions, and there was a stipulation, and then March, April 19th, 2022 status conference, why should Lattimore's entitlement to those pre-trial motions be reviewed for plain error? She raised the issues, right? Well, she, so I think we have to look at the way the request was raised and the language there. So, first of all, the deadline had passed in January, and so at the time of the stipulations, Hinckley and Ms. Lattimore, they could have requested more time for the Rule 12 motions. They only requested more time for the motions in Lemonnay, the pre-trial motions. Secondly, the language that Mr. Hinckley used in his hearing was something along the lines of, I haven't quite discussed this with my client yet, but there might be a motion to suppress, there might be other motions. And at that point, the court said, well, the deadline for motions is long past. If Hinckley wanted to raise an actual motion, he's experienced CJA counsel, he could have filed that motion untimely with a showing for good cause, or he could have pressed the issue at that very hearing. He could have said, Your Honor, there is good cause here. I was just appointed. I suppose he had other reasons, whatever his reasons were, but he didn't press the issue. He didn't file any more motions outside of the deadline. So, the court ultimately was never presented with the decision of denying such an untimely motion. I think just one final point that I wanted to make here, which is with regard to the Sixth Amendment claim, should the court reach that here on direct appeal, is the Sixth Amendment is not unlimited. I think the court has made that very clear. And it's ultimately the underlying premise that gives meaning is that the Sixth Amendment is here to assure fairness in the adversarial criminal process. And it's about protecting the fairness of that process. It's fundamentally a trial right. And Ms. Latimer here received more than adequate representation and a fair trial here, despite the difficult circumstances and challenges that she had with her attorney. The Sixth Amendment right does not mean that a defendant gets a new attorney every time he or she has a serious conflict with their attorney and unilaterally causes a breakdown in their relationship. That, unfortunately, is what occurred here. And Ms. Latimer still, despite the challenges, was able to receive everything that the Sixth Amendment guarantees. Okay. Your time is up, counsel. Let me ask my colleague whether either have additional questions. I think not. Thank you very much. Thanks to the government. Thank you. So, defense, you have a little rebuttal time. Do you say Richardson-Royer? Is that the right way? Richardson-Royer. Sorry. It's a mouthful. I wanted to start just to respond to my colleague's comment that the district court clearly understood the law. And I think that there are two places when the district court got it wrong. And I just wanted to draw this court's attention. At ER 8, the court twice said, despite their disagreements, their objectives remained the same. And that's really not the test for whether there's been a complete breakdown in communication between an attorney and a client. The fact that the attorney remains competent or still has the objective of defending the client doesn't matter. And this court has said that in Nguyen, in Musa, in D'Amore, in multiple cases, that the competence, the remaining competence of the attorney doesn't matter. Counsel, I got to say, it's very rare to see so many lawyers removed, basically, at a client's request and not have it be deemed a bit of an aberration and certainly not a normal kind of thing. We've all seen instances where counsel simply cannot agree from the get-go. But your client filed claims with the state bar, as my colleague has pointed out, and I think at least two times and was in the process of filing a third. She just was very, very, very, very difficult to get along with. And she was bringing up all kinds of . . . basically, she wanted to run the trial. And that's not her role, unless she's going to represent herself. How can we get past that? I mean, the district judge is in as good a position as anybody to evaluate whether there's a real breakdown or whether there's simply a conflict of roles here. What should we be doing in this situation? I think, I mean, the record shows that Ms. Lattimore had conflict with counsel. The two bar complaints that we know she filed against prior counsel, she filed them after those lawyers withdrew. So I don't know that . . . But she threatened them before, I think, right? There's nothing in the record to show that. So I think the fact that she had conflict, it doesn't mean that the Court didn't need to look at this conflict still and see the complete breakdown that occurred. And that complete breakdown had never occurred before in this way. So this is a new and more, you know, they're cursing at each other. They're screaming. It's very dramatic. It's a different situation. And I think that the Court's finding that Mr. Hinckley still shared the objectives of Ms. Lattimore doesn't . . . isn't enough to cure this dramatic breakdown in the relationship. You know, the way I read that passage was he was talking about a traditional conflict, not the complete breakdown conflict. You read it differently. I think . . . What he said was, he said, he goes through it. I'm sorry, I was on the wrong page. For all the disagreements, you've had challenging communications, but he's been confident, and he's not demonstrating a conflict of interest where his objectives are different from yours. I read that as a traditional conflict, not a conflict based on complete breakdown. But you read it differently? I read it the same way that Your Honor does. It's that I think that that's the wrong standard to apply. Well, no, I think he was just ruling out a traditional conflict. That's the way I read the record. And then he goes on to cite the cases and talk about the rest of it. But I take your point. Yeah, okay. I think that analysis really had no place, I think, in the order. So to me, it shows that the Court didn't quite understand the analysis. But we can disagree. Your time is up. Let me ask my colleague whether either has additional questions. Thanks to both counsel for your argument in this case. Thank you. The case of United States v. Lattimore is submitted.
judges: THOMAS, SMITH, Rayes